## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| MICHAEL CALLAHAN | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03CV213 (CFD) |
| | : | |
| v. | : | |
| | : | |
| WORLDWIDE WINES, INC | : | |
| Defendant. | : | |
| | : | JANUARY 28, 2004 |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
### THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

The above entitled case involves claims by the plaintiff, Michael Callahan, that he was terminated by his employer, Worldwide Wines, Inc., in retaliation for taking time off the job in the year 2000 as a result of his use of the Family Medical Leave Act (FMLA) due to a disability caused by Hepatitis C and because of absences caused by workers' compensation leave due to injuries to his back and ankle.  On or about January 7, 2003, the plaintiff filed a four count complaint in Connecticut Superior Court alleging claims under C.G.S. § 31-290a for workers' compensation retaliation, C.G.S. §§ 46a-58 and 46a-60(1), the Connecticut Fair Employment Practices Act ("CFEPA") for discrimination on the basis of a chronic physical impairment, 29 U.S.C. § 2601 et seq, the Family Medical Leave Act ("FMLA") and violations of C,G.S. § 31-128g, the personnel file act.  On January 31, 2003, the defendant removed the case to the United States District Court, District of Connecticut.

**ORAL ARGUMENT REQUESTED**

- 2 -

On November 13, 2003, the defendant filed a Motion for Summary Judgment as to all of the plaintiff's claims.  The plaintiff opposes the defendant's motion for summary judgment with respect to his claims arising under C.G.S. § 31-290a for workers' compensation retaliation, 29 U.S.C. § 2601 et seq , and the Family Medical Leave Act ("FMLA").   The plaintiff drops his cause of action with respect to C.G.S. §§ 46a-58 and 46a-60(1), the Connecticut Fair Employment Practices Act ("CFEPA") for discrimination on the basis of a chronic physical impairment and for violations of C,G.S. § 31-128g, the personnel file act.[1]   The plaintiff argues below that summary judgment is inappropriate in this case on the two remaining counts because there are many disputed issues of material fact and serious issues with respect to the defendant's motivation for the termination which must be resolved by the trier of fact.

---

[1] While the plaintiff drops the claim for relief under the Connecticut Personnel Files Act he will seek through pre-trial motions in limine to restrict the defendant's use of documentary evidence at trial which was required by statute to be included in the plaintiff's file and was not, and for its complete failure for over two years to provide the plaintiff's file to him despite his repeated requests to do so.  The plaintiff only received his personnel file in May 2003 in response to a discovery request in this case.  His first request for his file was on February 12, 2001.  It will be the plaintiff's position in the motion in limine that the defendant's failure to comply with its obligations under the Connecticut Personnel Files Act as well as its failure to provide the file and other documents upon which it relied in taking its adverse action against the plaintiff pursuant to the disclosure and production obligations imposed during the CHRO administrative process should deprive the defendant of the use of those documents at trial.  Moreover, as the plaintiff more fully argues below, it will ask the jury to make a negative inference from the fact that while it was refusing to timely provide the personnel file to the plaintiff, the defendant was simultaneously "reviewing" and "adding" items to the file and "deleting" some documents from the file.  In addition, since none of the documents defendant claims to have relied on to reach the conclusion about "low productivity" were in the plaintiff's personnel file, a reasonable jury could conclude that the proffered reason was merely pretextual.

- 3 -

## II.    FACTS

In addition to the fact narrative set forth below, the plaintiff adopts by reference and incorporates as facts supporting his opposition to the motion those contained in his Local Rule 56(a)(2) Statement filed with this opposition brief.

Michael Callahan worked for Worldwide Wines, Inc. as a delivery truck driver for nearly eighteen years.  He first worked for Worldwide from 1980 until 1986.  He left his employment with the company at that time to pursue work and living opportunities in Florida.   He returned to Connecticut in 1988 and was re-employed by the company in September, 1988.   He worked continuously, from that time, for Worldwide until his termination on February 1, 2001.  (Affidavit of Michael Callahan, ¶2, attached to Rule 56(a) (2) Statement as Exhibit 2, hereinafter "Callahan Aff. __".)  For a period of time from 1996 until December, 1999, Callahan was on a less than full time schedule with Worldwide due to his obligation to return to the warehouse no later than 5:00 p.m. each day in order to pick up his children at child care.[2]

As a delivery driver for the defendant, Callahan's job was to delivery wine to the company's customers on a designated delivery route.  He worked four, ten-hour days, from Tuesday though Friday.  The work involved a great deal of lifting of heavy cases and pushing cases loaded on hand trucks.  Callahan Aff. ¶¶3, 4.

In May, 1998, Callahan injured his lower back in the course of his employment, notified the defendant and then submitted a workers' compensation claim with the

---

[2]  Callahan had legal custody of his children.  In December, 1999 he requested to return to full time, or a 40 hour per week guarantee, since he no longer was required to get his children at child care by 6:00 p.m. Callahan Aff. ¶8.

- 4 -

defendant's insurance carrier.  As a result of that injury, the plaintiff lost seven (7) days of work and required another three (3) days of restricted activity.  In May, 1999, Callahan re-injured his lower back and processed another claim for workers' compensation.  That injury resulted in a loss of ten (10) days of work.  In 2000 Callahan suffered a series of additional injuries at work resulting in a substantial amount of lost time from his job.  On January 18, 2000 he injured his ankle at work, filed a workers' compensation claim and lost fifteen (15) days from work.  On May 19, 2000 Callahan suffered a cervical strain at work causing him to miss another seven (7) days and to file another workers' compensation claim.  Finally, on November 22, 2000, Callahan re-injured his lower back and lost the balance of the work year or another twenty-one (21) days from work.  He did not return to work until January 8, 2001, losing an additional four days of work in 2001.  In total, Callahan lost sixty-four (64) days from work due to workers' compensation injuries from May, 1998 through December, 2000 with forty-three (43) of those absences in the year 2000.   Callahan Aff. ¶25; Employee Injury Reports, attached to Rule 56(a) (2) Statement as Exhibit 4, hereinafter "Exhibit 4".

Prior to his last back injury, Callahan informed Gary McCabe, the defendant's comptroller, on or about August 20, 2000, that he was rated as 10% disabled due to his back injuries, by the Workers' Compensation Commissioner on August 16, 2000. Callahan Aff. ¶26.

In October, 1999, Callahan informed the defendant that he had been diagnosed as having Hepatitis C, a chronic disease that impairs liver function.  As a result of this diagnosis, Callahan was required to begin treatment in February, 2000.  Drug therapy for this disease makes it impossible to continue working during treatment requiring

- 5 -

Callahan to request time off the job under the Family Medical Leave Act.  The plaintiff was out on FMLA leave for treatment from February 14 through March 17, 2000 and again for a second round of therapy from June 5 through August 6, 2000.  The defendant does not provide for any salary continuation during FMLA leave but does continue to provide group medical benefits.  Upon the completion of his FMLA leaves for Hepatitis C treatments, the plaintiff requested to take his two-week paid vacation and returned to work full time on August 20, 2000.  Callahan Aff. ¶24.

Because of his various workers' compensation claims and time off on FMLA leave, Callahan actually worked for Worldwide Wines for no more than twenty (20) weeks during the year 2000.  Callahan Aff. ¶29.

Four weeks after returning from this most recent workers' compensation injury, Callahan was informed by McCabe, on February 1, 2001, that he was being terminated for "poor performance."   On that same day, the defendant terminated two other drivers, Greg Mihalko and Roger Watson.  At the time of their firings, Callahan, Mihalko and Watson had the highest number of days lost to workers' compensation injuries among Worldwide Wines' employees for the past three years.  Besides Callahan's 64 days[3] Watson had lost 35 days to injuries and Mihalko lost 21 days.   The next nearest employees were Munir Odeh with twelve (12) days lost to a workers' compensation injury in 2000 and Billy Schwabe who lost ten (10) days in 1999.   Callahan Aff. ¶31;

_____

[3]  Besides the 60 days of lost time and thee (3) days of restricted duties showing on the OSHA Logs for 1998 - 2000, Callahan also was out on workers' compensation for the first four (4) days of the 2001 work year.  Because Worldwide Wines operates on a ten hour day, Callahan's 64 days of injuries amounted to 640 compensated lost-time hours which is equivalent to 80 eight-hour days and 16 weeks of work.

- 6 -

OSHA Summary Log, attached to Rule 56(a) (2) Statement as Exhibit 5, hereinafter "Exhibit 5".

From the time he returned to work in August, 2000 until the date of his termination in February, 2001, Callahan was not counseled by anyone in management of the company regarding his performance or productivity as a driver.  In fact Callahan had no discussions with anyone in company management nor with any other non-managerial employees regarding his performance or productivity at any time after his return to full time status in December, 1999.   While working a reduced schedule due to child care responsibilities from 1996 to December, 1999, Callahan had, on occasion, had discussions with McCabe and warehouse employees Felix Butot and Tony Pelosi regarding undelivered orders he returned on his truck.   During those discussions Callahan and Pelosi disagreed about causes for failing to make some deliveries with Callahan attributing the problem to inefficiency from poor route design which made him continually double back over the same territory during the course of a day.  Pelosi and Butot, as evening shift warehouse employees, were responsible for route design and loading the delivery trucks for the next day.  Throughout his entire tenure with Worldwide Wines, Callahan never received any oral or written warnings regarding his performance or productivity.[4]  Callahan Aff. ¶¶10, 11, 12, 13, 14, 15.

While Callahan was aware that since late 1999 the company had been using

---

[4] Callahan received a written warning in 1997 for his alleged failure to return a signed invoice from an order.  Again in 1999 he received a written warning for the same alleged infraction.  In October, 1998, Callahan also received a warning for "excessive absenteeism."  Callahan was disciplined at that time for absences which included time off the job due to workers' compensation injuries.  Personnel File of Michael Callahan attached to Rule 56(a) (2) Statement as Exhibit 6, hereinafter "Exhibit".

- 7 -

some sort of a productivity formula to track driver performance, no member of the defendant's management nor anyone else employed by the company had ever spoken specifically to Callahan about the formula, the rating of employee performance, or his own individual performance.  Callahan Aff. ¶¶18, 19, 20.

As a small employer, Worldwide Wines was sensitive to the rising cost of workers' compensation insurance premiums in 1998, 1999 and 2000.  As comptroller for the corporation, McCabe kept track of cost issues as they related to operational expenses.  One of those cost items he tracked was workers' compensation expenses.  Deposition testimony of Gary McCabe, pp. 124-129, attached to Rule 56(a) (2) Statement as Exhibit 3, hereinafter "McCabe Tr. __".

During calendar year 2000, McCabe specifically tracked Callahan's use of both workers' compensation time and medical leave under the Family Medical Leave Act.  McCabe Tr. 137-139.  At the same time McCabe was compiling this record with respect to Callahan's time off the job due to FMLA and workers' compensation leave, he became upset when he learned of the 10% disability rating for Callahan's back from the plaintiff and not directly from the insurance carrier.  Deposition testimony of Michael Callahan, p. 92, attached to Rule 56(a) (2) Statement as Exhibit 1, hereinafter "Callahan Tr. __"; McCabe note on Callahan 10% disability, attached to Rule 56(a) (2) Statement as Exhibit 15, hereinafter "Exhibit 15".

By the time Callahan returned to work after his last workers' compensation injury, he had lost a total of nearly twenty six weeks of work during 2000 due to his FMLA leave and work-related injuries.

- 8 -

### III.    THE LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted only if the moving party is able to show that, "there is no genuine issue as to any material fact," and that it is, "entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c).  A "material fact" is one whose resolution will affect the ultimate determination of the case.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).  A "genuine" issue as to such a material fact "only arises if the evidence would allow a reasonable jury to return a verdict for the non-moving party." Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988); Anderson, 477 U.S. at 248.  See also Bickerstaff v. Vassar College, 196 F.3d 435, 445 (2d Cir. 1999)(citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial."  Id.

The moving party bears the initial burden of proving that no factual issues exist. Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223 (2d Cir. 1994).  The non-moving party must then make a "showing sufficient to establish the existence of an element essential to that party' s case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrell, 477 U.S. 317, 322-323 (1986).  The Court must resolve all ambiguities and draw all inferences in the light most favorable to the non-moving party.  Gallo, 22 F.3d at 1223.

The trial court' s task at summary judgment "is carefully limited to discerning whether there are any issues of material fact to be tried, not to deciding them."  LaFond v. General Physics Services Corp., 50 F.3d 165, 171 (2d Cir 1995), citing Gallo, 22 F.3d

- 9 -

at 1224.  Thus, the proper inquiry in a summary judgment motion is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Anderson</u>, 477 U.S. at 251-252.  If there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper."  <u>Chambers v. TRM Copy Centers Corp</u>., 43 F.3d 29, 37 (2d Cir. 1994).

Importantly, in employment cases such as this one, trial courts must be particularly cautious about granting summary judgment because in such cases the employer's intent is ordinarily at issue.  See <u>Chertkova v. Connecticut Gen. Life Ins. Co.</u>, 92 F.3d 81 at 87 (2d Cir. 1996); <u>Shaw v. Shell Oil Co.</u>, 119 F. Supp. 2d 62, 67 (D.C. Conn, 2000); <u>Peralta v. Cendent Corp.</u>, 123 F. Supp. 2d 65, 75 (D. Conn. 2000).

## IV.   <u>ARGUMENT</u>

A.   <u>A Reasonable Jury Could Find That The Defendant Terminated The Plaintiff's Employment Because He Exercised His Rights Under The Workers' Compensation System And Engaged In Protected Activity</u>

The defendant argues in its Motion that it is entitled to summary judgment on the plaintiff's claim under Conn. Gen. Stat. §31-290a because the plaintiff has failed to

- 10 -

establish a *prima facie* case or offer evidence of pretext.  The defendant is wrong on both counts.

Conn. Gen. Stat. §31-290a is an anti-discrimination statute prohibiting retaliation against an individual for exercising rights under the workers' compensation statutes, and provides, in relevant part, that:

> No employer...shall discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter.

The legal framework for analyzing a claim for violation of C.G.S. §31-290a is clear.  The plaintiff must first make out a *prima facie* case.  The burden the plaintiff must meet in order to defeat a motion for summary judgment at this stage is *de minimis*.  Rodriguez v. Host International Inc., 2000 WL 1995589 (Conn. Super.) * 3,[5] citing McLee v. Chrysler Corp., 109 F. 3d 130, 134 (2d Cir. 1997); D'Agata v. Sears, 1999 WL 643189 (Conn. Super.) * 3.

> The plaintiff, to make our a *prima facie* case of retaliatory discharge, must establish, through *de minimis* evidence, (a) participation in a protected activity known to the defendant, (b) an employment action disadvantaging the plaintiff, and (c) a causal connection between the protected activity and the adverse employment action.

Rodriguez, 2000 WL 1995589 at * 3, citing Dubois v. State of New York, 966 F. Supp. 144, 147 (N.D.N.Y. 1997).  See also: Johnson v. Palma, 932 F. 2d 203, 207 (2d Cir. 1991); Eristoy v. Merrow Machine Co, 34 Conn. App. 709, 712 (1994).  A causal connection necessary for a *prima facie* case "may be established in where the protected activity was followed closely by discriminatory treatment."  Rosenberg v.

---

[5] Connecticut cases collected and attached as Exhibit 17.

- 11 -

Meriden Housing Authority, 1999 WL 1034611 (Conn. Super.) (internal cites omitted); See also, Richardson v. New York State Dept of Corrections Serv., 180 F. 3d 426, 447 (2d Cir. 1999).

Claims under Conn. Gen. Stat. §31-290a are subject to the familiar burden allocation from federal law. Ford v. Blue Cross & Blue Shield of Conn, Inc., 216 Conn. 40, 52 (1990). Once a *prima facie* case is established, a presumption arises that the employer unlawfully discriminated and the burden shifts to the defendant to proffer a nondiscriminatory reason for its action. Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997). When the employer articulates such a reason, the burden once again shifts to the plaintiff to demonstrate "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S. Ct. 2097 (2000). Although the presumption drops out of the case "the trier of fact may still consider the evidence establishing the *prima facie* case and inferences properly drawn therefrom...on the issue of whether the defendant's explanation is pretextual." Reeves, 530 U.S. at 143, citing St Mary's Honor Center v. Hicks, 509 U.S. 502, 511,113 S. Ct. 2742 (1993) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255, n. 10, 101 S.Ct. 1089 (1981). In a discrimination case such as this one, the plaintiff is not required to prove that retaliation for filing workers' compensation claims was the only or primary motive for the adverse employment action nor that the reason proffered by the defendant played no role in the decision. It is enough for the plaintiff to show that retaliation for filing workers' compensation claims played a motivating role, or contributed to the employer's decision. Holtz v. Rockeller & Co., 258 F.3d 62, 78-79

- 12 -

(2d Cir. 2001); Renz v. Grey Advertising, Inc., 135 F.3d 217, 220-222 (2d Cir. 1997);

Cronin v. Aetna Life Insurance Co., 46 F.3d 196, 203 (2d Cir. 1995).

The thrust of the three-part analysis explained in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973) was to create a mechanism to allow victims of

discrimination to establish their case through inferential and circumstantial proof. See

Trans World Airline v. Thurston, 469 U.S. 111, 121, 105 S. Ct. 613 (1985). To meet

this burden, the plaintiff may rely "on the evidence constituting the *prima facie* case,

together with supportable inferences to be drawn from the false or erroneous character

of the employer's proffered reason for the adverse action." Carlton v. Mystic Transport,

Inc., 202 F.3d 129, 135 (2d Cir. 2000). A finding of pretext may be supported by

evidence that the defendant has given conflicting, inconsistent or less than credible

explanations for its treatment of the plaintiff. Tolbert v. Queens College, 242 F.3d 58,

70 (2d Cir. 2001). Although a finding of pretext does not "compel" a finding of

discrimination, since Reeves it is clear that where a reasonable jury could find that the

employer's explanation is pretextual, considered together with the evidence that makes

up the plaintiff's *prima facie* case, summary judgment is precluded. See, Zimmerman v.

Associates First Capital Corp., 251 F.2d 376 , 382 (2d Cir. 2001). Reeves 530 U.S. at

148.

Here there is sufficient evidence from which a reasonable jury could find that the

plaintiff established a *prima facie* case. In the year 2000 alone, Callahan had three (3)

separate work-related injuries for which he filed workers' compensation claims through

the defendant's insurance carrier. These injuries required substantial time off the job.

All of this is undisputed. Three and a half weeks after returning to work from his last

- 13 -

injury, Callahan was discharged by the defendant.  This is undisputed.  A reasonable

jury could clearly conclude that the plaintiff has demonstrated that he participated in

protected activity known to the defendant (filed his compensation claims) and that he

suffered some adverse employment action (he was fired).  From the facts a reasonable

jury could also infer the third element, that there is a causal connection or link between

the plaintiff's protected activity and his discharge.

McCabe, the defendant's comptroller and one of the decision makers, admitted

that workers' compensation costs were of concern to the company and that premium

costs had been rising.  McCabe also conceded that an employee with multiple work-

related injuries might be more likely to re-injure themselves and that such multiple

injuries increase the cost of insuring their workforce.[6]  Against this background

McCabe, as the chief of operations and company comptroller, specifically tracked the

time the plaintiff was using of his statutorily entitled workers' compensation and FMLA

leave.[7]  In addition, McCabe, as one of the company decision makers, had previously

disciplined the plaintiff in 1998 for "excessive absenteeism," including time spent on

---

[6]  At his deposition, McCabe discounted the fact that a carrier would necessarily track whether or not an employee had multiple injuries or repetitive injuries to the same part of the body.  McCabe Tr. 127-129.  Yet McCabe's telephone notes from a conversation with the defendant's workers' compensation administrator demonstrates that McCabe himself was concerned enough about repetitive injuries with respect to one employee to apparently raise the issue with the defendant's workers' compensation administrator.  Telephone Notes, attached to Rule 56(a) (2) Statement as Exhibit 7, hereinafter "Exhibit 7".

[7]  McCabe claimed that he did so at the plaintiff's request.  The plaintiff made no such request.  Callahan Aff. ¶29.  This disputed fact about tracking the plaintiff's use of his compensation and FMLA leave is, in and of itself, clearly material to the issue of pretext and the defendant's motive and precludes summary judgment.  The tracking list is attached to Rule 56(a) (2) Statement as Exhibit 14,  hereinafter "Exhibit 14".

- 14 -

workers' compensation leave.[8]

The defendant claims that it made the decision to terminate Callahan in October, 2000 but kept the decision secret. Neither Weiss or McCabe made any notes of this alleged conversation and decision nor did they share this decision with any other individuals. Nothing to support the October decision appears in the plaintiff's personnel files. In fact the only evidence of any conversation or contact with anyone, other than the plaintiff, regarding his termination was a note sent to the bookkeeper on January 30, 2001, two days before McCabe told Callahan he was fired, to prepare a termination slip for Callahan. Memo from Gary McCabe to Nancy Marcella, January 30, 2001, attached to Rule 56(a) (2) Statement as Exhibit 9, hereinafter "Exhibit 9". When Callahan, following his November 22, 2000 injury, expressed concern for his job because of his absences that year, McCabe reassured him that he did not need to worry. Callahan Aff. ¶33. Callahan had never been told by anyone in the management of the company that his job was in jeopardy for any reason. A jury could reasonably conclude from this evidence that the decision to terminate Callahan had been made

---

[8] At deposition McCabe conceded that it was inappropriate to have charged workers' compensation absences against the plaintiff for disciplinary purposes. McCabe Tr. 83. Nonetheless the fact that he did so in late 1998, following the plaintiff's first work-related injury, is telling. McCabe admits reviewing the underlying documentation provided to him prior to issuing the disciplinary warning to the plaintiff. That document clearly indicates that the absence during the week of June 10, 1998 was for "workers' compensation." Final Written Warning, 10/14/98, attached to Rule 56(a) (2) Statement as Exhibit 8, hereinafter "Exhibit 8". So he knew at the time he issued the discipline that one of the days charged against Callahan for discipline purposes was one he was legally entitled and protected to take. Although the defendant now tries expiation for that previous retaliatory activity, it clearly demonstrates the defendant's sensitivity to time taken off the job by its employees for work injuries and a jury would be entitled to infer a discriminatory intent to the 2001 discharge from this previous activity.

- 15 -

after his latest workers' compensation injury on November 22, 2000.  Moreover, a dispute on such a materially relevant issue as the timing of a decision to terminate goes to the heart of the question of the defendant's intent and precludes summary judgment for this reason alone.

The two individuals discharged along with Callahan (Mihalko and Watson) each had a large number of days lost in the previous two years to workers' compensation injuries.  Callahan, by the time of his return on January 8, 2001, had been out nearly seven weeks with this latest injury and had lost a total of almost eleven weeks from work injuries since the beginning of 2000 and a total of sixteen weeks of work due to injuries since the summer of 1998.   The Worldwide Wines employees with the next highest amount of time lost to work-related injuries were Roger Watson with nearly nine weeks and Gregg Mihalko with four and a half weeks off the job.[9]  All three employees were terminated by the defendant.

---

[9]  The next closest employees with lost time injuries according to the official OSHA logs maintained by the company, for 1998-2000, were Munir Odeh who lost 12 days and Billy Schwabe who lost 10.  Exhibit 5.  While these individuals did not lose their jobs, other company documents reinforce the concern the defendant had for any time lost due to compensation claims.  Notes from conversations with the defendant's compensation administrator from May 19, 2000, show that the company was particularly concerned about repetitive injuries and questioned, in relation to Schwabe's 5% rating, at "what point is an employee no longer fit?"  Exhibit 7.  It will be recalled that three of Callahan's four work injuries were to his lower back region (Exhibit 4) and that the company became aware in late August or early September that Callahan had a 10% disability rating.  A reasonable jury could infer that if the company was concerned enough about the continued employment of an individual with repetitive injuries and a 5% rating, it would be quite concerned about an employee with a disability rating of 10% from repetitive injuries to the same region of the body and who had nearly sixteen weeks of absence from those injuries.  From these facts, along with Callahan's termination, a reasonable jury could conclude that the plaintiff's workers' compensation injuries and absences played a factor in the decision to terminate his employment.

- 16 -

Underscoring the plaintiff's claim here that his protected activity played a motivating factor in his discharge are the company documents related to Gregg Mihalko's performance in the twelve months prior to his discharge for alleged "poor performance." Company documents labeled "Analysis Sheet/Route Productivity," show the relative rankings of delivery drivers[10] for the 26 week period of July 6, 2000 to December 31, 2000. (Defendant's Exhibit 20, attached to Defendant's Rule 56(a)(1) Statement.) During this six-month period of time, Gregg Mihalko is given a relative ranking of "5" which is just above the middle for all drivers in terms of the company's productivity measurement. Despite the fact that there were six other employees with lower relative productivity rankings than Mihalko, only he, Watson and the plaintiff were terminated for "low productivity." None of the employees with lower productivity than Mihalko, with the exception of Watson and the plaintiff, had any appreciable time off the job due to compensatory injuries.[11] If Mihalko was terminated for "low productivity" why weren't the employees immediately lower than him on the ranking chart also terminated?[12]

---

[10]  These spread sheets were apparently created based on the weekly route sheets compiled by the defendant based on its productivity formula. McCabe Tr. 30-35. Problems with the defendant's productivity analysis evidence is discussed in detail in Section B, *infra.*

[11]  The person immediately below Mihalko on the spread sheet, Billy Schwabe, had lost time of only 10 days in the previous year and the OSHA logs for 1998-2000 show no lost time accidents for either neither "mike c" or "mike p" . Exhibit 5.

[12]   These employees are "mike c", "mike p" and "billy." "Billy" refers to Billy Schwabe. "Mike C" is not the plaintiff. Callahan is designated "MRC" on the employer documents.

- 17 -

The company claims that Mihalko wasn't really terminated for "low productivity" but for "milking"[13] his route. McCabe Tr. 141-142. McCabe and Weiss both claim that the decision to fire Mihalko for this alleged "milking" took place during that same putative October, 2000 conversation in which they decided to discharge the plaintiff. McCabe Aff. ¶80, attached to Defendant's Rule 56(a)(1) Statement; Weiss Aff. ¶34 attached to defendant's Rule 56(a)(1) Statement. Yet we already know that no written record exists to corroborate that memorable meeting. Moreover, it is not unreasonable to assume that if this alleged "milking" was occurring for a long time, as they claim, and McCabe and Weiss considered it a violation of company policy, some disciplinary notation or warning of some kind would issue by the company to put Mihalko on notice. No such disciplinary notice was ever issued to Mihalko.[14] Since the defendant's own records indicate that Mihalko was fired for "low productivity"[15] and at least three other employees with worst productivity were not, a reasonable jury could infer that Mihalko was fired for the only reason he apparently had in common with the plaintiff - a lot of time lost to workers' compensation injuries. A reasonable jury could then conclude that the plaintiff's protected activity was a motivating factor, or made a difference in the

---

[13] McCabe claimed that Mihalko deliberately slowed down on his route in order to get additional overtime. (McCabe Tr. 142)

[14] In response to the Plaintiff's First Request For Production, ¶16, the defendant provided copies of all disciplinary notices issued to employees at Worldwide Wines from January 1, 1998 to March, 2003. No discipline was ever issued to Mihalko for "milking" his route. Disciplinary Notices, attached to Rule 56(a) (2) Statement as Exhibit 10, hereinafter "Exhibit 10".

[15] List of Terminated Employees, 1/1/98 - 5/30/03, attached to Rule 56(a) (2) Statement as Exhibit 11, hereinafter "Exhibit 11."

- 18 -

decision to terminate his employment.

Contrary to the defendant's assertion with respect to the plaintiff's *prima facie* case, Callahan is readily distinguished from the plaintiffs in either Gallo v. Eaton Corp., 122 F. Supp. 2d 293 (D. Conn. 2000) or LaJeunesse v. Great Atlantic & Pacific Tea Company, 160 F. Supp 2d 324 (D. Conn. 2001). In LaJeunese the plaintiff lost his job in a reduction of force coincident with filing a claim for an injury occurring some three months previous. LaJeunese lost no time from work from his injury, had never been disciplined for previous workers' compensation absences, and there was no evidence that the employer tracked his absences from work or that the other two individuals discharged with him had previously filed workers' compensation claims. In Gallo there was no evidence beyond the fact that the plaintiff had filed an EEOC complaint some two years before his discharge to support a case of retaliatory discharge. Here not only is there clear evidence of protected activity and knowledge on the part of the defendant, there is sufficient evidence from which a reasonable jury could infer that there was a casual connection between that protected activity and the decision to terminate the plaintiff's employment. There are triable issues of fact precluding summary judgment.

B.     A Reasonable Jury Could Find That The Defendant's Explanation for Terminating The Plaintiff's Was Merely Pretextual And That Its Real Reason Was Retaliation For Exercising His Rights Under The Workers' Compensation Act

The principal justification by the defendant for the plaintiff's discharge is that he had poor performance as measured by the defendant's productivity system and that was the sole reason for his termination. However when subject to serious scrutiny, the

- 19 -

defendant's justification simply does not hold up.  A reasonable jury could find, based on the evidence, that this explanation is merely a pretext for discrimination.

As an initial matter, the defendant's treatment of the plaintiff's request for his personnel file pursuant to Conn, Gen. Stat. § 31-128b raises questions with respect to the defendant's motive and intent and cast serious doubt on the credibility of the defendant's decision makers.

On February 12, 2001, the plaintiff sent a written request for a copy of his personnel file as authorized by the Connecticut Personnel Files Act, Conn, Gen. Stat. § 31-128g.  A week later, on February 20, 2001, he called Worldwide Wines and spoke with Nancy Marcella, the bookkeeper, and asked her about the status of his request.  Ms. Marcella told Callahan that she had completed making copies of the file and had given it to McCabe.  She told Callahan that McCabe was reviewing the file and making some additions to it.  Callahan Aff. ¶34.

One week later, on February 27, 2001, Callahan called Worldwide Wines again to find out the status of his request.  This time he spoke with McCabe who told him that he would finish the "project" in a day or two.  He told Callahan that he needed to consult with the company attorney regarding the file and that there was a "ton" of paper work in the file.  He also told Callahan that there were some things he was taking out of the file because Callahan "didn't need to see them" and a number of things he was adding to the file.  Callahan Aff. ¶34.  McCabe does not dispute that he was adding to and subtracting some items from the file or that he sent it for review to the company's attorneys.  McCabe Tr. 104-114.   Despite McCabe's assurance that he would finish in a "few days", Callahan never received the requested file.  Callahan Aff. ¶34.  On April

- 20 -

17, 2001, Attorney Gregg Adler wrote, on Callahan's behalf, to McCabe again requesting the file, pursuant to Section 31-128b. On April 26, 2001, McCabe left a voice message with Adler telling him that Callahan's file would be sent pending a "final review" of the documents in the file. Adler sent another letter to McCabe on May 8, 2001 informing him that despite the assurance provided in his voice message, Callahan had still not received the file. At that time Adler raised a concern with McCabe that such a long delay, over three months, in responding to Callahan's initial request raised some serious concerns about the integrity, completeness and accuracy of the file they agreed to send. Letters from Atty. Gregg Adler to Gary McCabe attached to Rule 56(a) (2) Statement as Exhibit 12, hereinafter "Exhibit 12".

The defendant never sent the file. The plaintiff filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO). In its Answer to the complaint, signed by McCabe, the defendant claimed that it had supplied Callahan with a copy of his personnel file. This was untrue. Callahan Aff. ¶35; Exhibit 16. Despite having requested it in February, 2001, the plaintiff only received a copy of his personnel file in May, 2003 in response to a discovery request in this lawsuit. Callahan Aff. ¶36.

From the defendant's unlawful delay in providing the personnel file to the plaintiff, undisputed evidence that it was edited and its false representations to CHRO,[16]

----

[16] Although the defendant also told CHRO in September 2001, in response to the Commission's Schedule A Requests For Information, that it would provide copies of its investigative reports and evaluations used in making its final decision to terminate Callahan, it never did so prior to the plaintiff requesting a release of jurisdiction in November 2002. Callahan Aff. ¶35. Defendant's Answer to CHRO Complaint and Responses to Schedule A, September 4, 2001, attached to Rule 56(a) (2) Statement as

- 21 -

a reasonable jury could easily draw  a negative inference with respect to the

defendant's motive as well as the truthfulness of its alleged reason for terminating the

plaintiff.  Disbelief of the defendant's proffered reason, along with inferences drawn

from the plaintiff's *prima facie* case is sufficient for a reasonable jury to conclude that

the defendant retaliated against Callahan because he engaged in protected activity.

There is more evidence, in addition, from which a jury could infer that the

defendant's proffered explanation is merely a pretext for discrimination.  The defendant

contends that the plaintiff had a long history, continuing up until he was terminated, of

failing to complete his route causing the warehouse crew to put items undelivered by

the plaintiff onto other driver's routes.  Yet not a single company document exists on

which the various complaints allegedly made by warehouse employees and drivers was

documented.  While the plaintiff readily admits that he had discussions on occasion

with both Boutot and Pelosi about his failure to complete the route, these discussions

took place while he was on a limited assignment basis due to his child care

responsibilities.[17]  After coming back to full time status in December,1999, the plaintiff

had no such discussions with Pelosi or Boutot.  Nor did he have a discussion with his

supervisor McCabe after December, 1999 about his performance or productivity.

Callahan Aff. ¶¶10 - 15 .

McCabe claims that Callahan was given a "disciplinary route change" in March,

---

Exhibit 16 , hereinafter "Exhibit 16".  The information requested in the CHRO Schedule
A should have been contained in Callahan's personnel file since C.G.S. §31-128b
requires the "personnel file" to contain all documents relied upon in making any adverse
employment action, including termination.

[17]  See foot note. 2,*supra*.

- 22 -

1999 and counseled about his performance.  According to Callahan no such counseling

conversation took place and his route change was a result of his ongoing request for

accommodation because of his child care responsibilities.  Callahan felt, and the

company agreed, that changing to a route closer to the warehouse would likely make it

easier for him to complete his route and get back to the warehouse by 5:00 p.m.  No

company document exists even remotely suggesting that the change in route for

Callahan was "disciplinary."[18]   In fact the document relied on by the company to show a

"disciplinary route change" only shows that Callahan and Watson would switch routes

and that Callahan's performance was below average at that time, a fact not inconsistent

with the plaintiff's recollection that his childcare responsibilities interfered with the timely

completion of his route at that time. (Defendant's Exhibit 11)[19]

One of the keystones of the defendant's proffered reason that Callahan's

termination was solely because of performance issues is the productivity formula and

weekly productivity reports generated by the company.  The plaintiff has admitted that it

─────────────────

[18]  Importantly, the company has issued such "disciplinary route changes" to drivers.  Exhibit 10 collects all company issued discipline to employees for productivity reasons from January 1, 1998 to June, 2003.  On May 13, 2003 the company issued a disciplinary route change to driver Leo McHugh.  A review of Exhibit 10 and Callahan's personnel file, Exhibit 6, shows no such disciplinary route change notice issued to Callahan at anytime and certainly not in March, 1999.  The absence of such a disciplinary notice to Callahan, in light of the evidence that the company does indeed issue such notices, cast serious doubt on McCabe's claim that the route change in March 1999 was disciplinary in nature.

[19]  It is undisputed that the defendant did not use its current system of tracking miles, cases and stops for driver productivity until some time after this document was created.  The relative rankings of drivers in McCabes' handwritten document was a result of his own audit of routes and records as well as anecdotal evidence acquired by him on the job.  McCabe Tr. 27-34.

would not be inappropriate for the company to use some measure of its employees'
productivity.  And has further admitted that there may be nothing inappropriate in the
formula used by Worldwide based on stops, cases and mileage.  But even a cursory
analysis of the weekly Analysis Sheets relied upon by the defendant shows that they
are seriously flawed not only with respect to their accuracy but also their reliability.   For
example, the Analysis Sheets for the year 2000, collected as Defendant's Exhibit 19
and attached to their Rule 56(a)(1) Statement, show multiple entries for the same
weeks.  There are at least eight (8) entries for the week "1/31/00 to 2/06/00" and five (5)
for the week "5/21/00 to 5/28/00."  For each of these Analysis Sheets there is
completely different information for each driver with respect to their mileage, cases and
stops and subsequently different index numbers for each day.  Plaintiff's Exhibit 13,
attached to Rule 56(a) (2) Statement, collects these discrepancies for the May 21 - May
28, 2000 entries.  Exhibit13a shows that "robbin" had 142 cases on Tuesday, 178 on
Wednesday, 165 on Thursday and 134 on Friday.  Yet Exhibit 13b shows that for the
same alleged period of time "robbin" had 251 cases on Tuesday, 262 on Wednesday,
106 on Thursday and 168 on Friday.  Likewise Exhibit 13c has "gregg" making 24 stops
on Tuesday, 32 stops on Wednesday, 21 on Thursday and 28 on Friday.  But Exhibit
13e has him with 32 stops on Tuesday, 27 on Wednesday, and no stops on either
Thursday or Friday.   A comparison of the entries for every driver on all the sheets in
Exhibit 13a - 13e shows completely different stop, mileage and case numbers for each
day of the week for all of the five weeks designated "5/21/00 - 5/28/00."   Which one is
really the accurate information for the week in question?

        McCabe speculated that these discrepancies could be a result of a failure by

- 24 -

Brian Kociszwski, the individual responsible for data input and productivity analysis, to change the "header" information each time he was inputting a new week.  McCabe Tr. 46.   Even if this explanation is true, and nothing in Kociszwski's affidavit attached to its Rule 56(a)(1) Statement addresses the issue, the documents themselves cannot tell us which is the correct information for "5/21/00 - 5/28/00."[20]   Moreover, McCabe's explanation about the process of recording the data opens up even more questions regarding not only the accuracy of the data but its reliability based on the ease with which data can be changed after the fact.  According to McCabe, once the data is put on the weekly analysis spread sheet, the resulting file can be accessed in the data base and changed.  The data for each week is not burned to a computer disk nor saved in a .pdf format.[21]  McCabe Tr. 50-51.  As a consequence, individuals with access to the database can reopen any spread sheet from any week and modify the entries.  Given the demonstrated discrepancies in the reported data and the acknowledged lack of security with respect to data and the spread sheets, a reasonable jury could have some justified doubts regarding, at a minimum, the reliability of the defendant's evidence. Coupled with the unjustifiable delay in supplying the plaintiff's personnel file a reasonable jury could have serious doubts with respect to the defendant's credibility

_____

[20] McCabe claims that the underlying documents from which the data is drawn would show which "5/21/00-5/28/00" is correct and which ones are attributable to other weeks. McCabe Tr. 46.  However, that documentation, if it exists, is not in evidence in this case.

[21] In a .pdf file, data is saved in a format which does not permit any altering or changes to the document.  This provides assurances that copies or subsequent accessing of the file will not result in any alterations to the original data.

- 25 -

and disbelieve its proffered explanation for Callahan's discharge.[22]

    C.    <u>A Reasonable Jury Could Find That The Defendant Terminated The Plaintiff's Employment Because He Took FMLA Leave In Order To Treat His Disability</u>

The plaintiff and defendant agree with respect to at least one thing in this case - the core of operative facts which apply to his retaliation claim under C.G.S. § 31-290a also apply to the analysis of his claims for retaliation under FMLA. For the same reasons, there are triable issues of fact which preclude summary judgment.

Unlike many FMLA claims the plaintiff does not allege that he was discriminated against because the defendant denied the leave or failed to return him to his former position or because he opposed a discriminatory policy. In fact the defendant granted the plaintiff's leave.[23] Rather, the plaintiff alleges that because he participated in an FMLA-protected activity, use of his medical leave to get treatment for his Hepatitis C disability, Worldwide Wines used that as a negative factor in making the decision to terminate him. In other words, the plaintiff's FMLA absences for fourteen weeks, when combined with his twelve and one-half weeks off the job due to three separate work

---

[22] Since Conn, Gen. Stat. § 31-128b requires that all personnel files contain the documents relied upon in making termination decisions, the two year long delay in providing the file along with the defendant's undisputed activity in adding to, deleting and reviewing the file provides sufficient grounds for such an adverse inference by a reasonable jury.

[23] The plaintiff probably was granted some additional weeks beyond his federal entitlement of twelve (12) weeks. However, given the fact that under state FMLA law the plaintiff's entitlement would be sixteen (16) weeks it can be argued that the defendant provided no more than required by law. Moreover, it is undisputed that the plaintiff's FMLA leave was unpaid so any extra weeks beyond his original twelve was at no additional cost to the defendant.

- 26 -

related accidents that year motivated the employer's action to terminate his job.

Callahan was simply too much of a liability to keep around anymore.

The FMLA creates a federally protected right that guarantees that when an

employee takes a medical leave it will not result in an adverse employment action.

Hale v. Mann, 219 F. 3d 61, 68 (2d Cir. 2000), Xin Liu v. Amway Corporation, 347 F. 3d

1125, 1132 (9th Cir. 2003).  The statute prohibits an employer from interfering with an

employee's exercise of his or her FMLA rights.  29 U.S.C. § 2614(a).  One form of

employer interference specifically targeted by the Department of Labor regulations is

discrimination because of an employee has used FMLA leave.  29 C.F.R. §825.220(c).

("[E]mployers cannot use the taking of FMLA leave as a negative factor in employment

actions, such as hiring, promotions or disciplinary actions.").[24]  In enforcing those rights

in litigation, the defendant is correct that there has been a split of authority in the

circuits on whether such interference should be analyzed under the traditional

McDonnell Douglas burden-shifting framework[25] or, consistent with the statutory

language, analyzed without the requirement to find discriminatory intent.  See,

Bachelder v. American West Airlines, Inc, 259 F. 3d 1112, 1124 (9th Cir. 2001); Mann v.

---

[24] As the agency authorized to implement the FMLA, DOL's regulations are entitled to great deference under Chevron USA, Inc. v. National Resources Defense Council, 467 U.S. 837, 843-844 (1984).

[25] The McDonnell-Douglas approach is used to analyze FMLA retaliation cases by the  First, Fifth, Seventh and Tenth circuits.  See Hodgens v. General Dynamics Corp., 144 F. 3d 151(1st Cir, 1998); Chaffin v. John H. Carter Co., 179 F. 3d 316 (5th Cir. 1999); King v. Preferred Technical Group, 166 F. 3d 887 (7th Cir. 1999); Morgan v. Hilti, 108 F. 3d 1319 (10th Cir. 1998).

- 27 -

Mass. Correa Elec., J.V., 2002 WL 88915 (S.D.N.Y.) * 6.[26]  Under this analysis a

plaintiff need only show that they participated in an FMLA protected activity and the

decision to terminate was motivated by participation in that protected activity.  Mann,

2002 WL 88915 at *7.  The more familiar burden-shifting approach for FMLA claims is

similar to the analysis for the plaintiff's claim under C.G.S. § 31-290a.  Darboe v.

Staples, Inc., 243 F. Supp. 2d 5, 16 (S.D.N.Y. 2003); Brenikka v.Lasora Buick, 2002

WL 1059117 * 7 (S.D.N.Y.).  The Second Circuit has not yet considered the issue.

        Regardless of the analysis used, the plaintiff can clearly show that he

participated in a protected activity and that he suffered an adverse employment

decision.  Moreover there is sufficient evidence from which a reasonable jury could

conclude that there is a nexus between his use of his FMLA leave and his discharge.  If

a jury disbelieves the reasons offered by the defendant for its termination of Callahan

and concludes that they are merely a pretext for discrimination against the plaintiff for

his protected activity under the Connecticut workers' compensation statutes, the jury

could also conclude that such discrimination based on Callahan's excessive time off the

job was motivated, in part, by his use of FMLA leave for his disability.

---

[26]  The 9th circuit, in Bachelder, carefully analyzed the statutory language and
legislative history of the FMLA and concluded that other Circuits were misled by the
DOL regulations with respect to Section 2615(a)(1) which mention the word
"discrimination."  As a result they have applied the burden-shifting analysis from
traditional discrimination jurisprudence to cases of "interference" with an FMLA right, as
well as to cases arising from discharging or discriminating against anyone who opposes
an unlawful practice (Section 2615(a)(2)) or participates in the process to enforce a
right (Section 2615(b)).  Bachelder 259 F. 3d at 1123.  In both Bachelder and Mann, the
courts reasoned that the "interference" language of the statue was more closely
analogous to the "interference" language of Section 8(a)(1) of the National Labor
Relations Act.  Bachelder 259 F. 3d at 1123,  Mann v. Mass. Correa Elec., J.V., 2002
WL 88915 (S.D.N.Y.) * 6.

- 28 -

**V.     <u>CONCLUSION</u>**

Based on the foregoing arguments and because there are genuine issues of material fact in dispute, the defendant's motion for summary judgment should be DENIED.

Respectfully submitted,
THE PLAINTIFF,


By:    _____
       Henry F. Murray ct17234
       Gregg D. Adler  ct05698
       Livingston, Adler, Pulda, Meiklejohn
         & Kelly, P.C.
       557 Prospect Avenue
       Hartford, CT 06105-2922
       (860) 233-9821


## CERTIFICATE OF SERVICE

        This is to certify that a copy of the foregoing Plaintiff's Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment has been sent by first-class, postage prepaid mail on this 28th day of January, 2004 to the following counsel of record:


Marc P. Mercier
Beck & Eldergill, P.C.
447 Center Street
Manchester, CT 06040



                                    _____
                                    Henry F. Murray