UNITED STATES DISTRICT COURT

# DISc:cr6PV1CUT

```
* * * * * * * * * * * * * * * * * *
                                    *
                                    *
MICHAEL CALLAHAN,                   ^
        Plaintiff,
                                    * Civil Action No. *
VS.                                 3:03CV213 (CFD) *
                                    August 18, 2003
WORLDWIDE WINES, INC.,              *
        Defendant.                  *
                                    *
* * * * * * * * * * * * * * * * * *
```

**DEPOSITION OF GARY MCCABE**

Taken on behalf of the Plaintiff in the above-entitled cause, before Patricia Tyszka, Registered Merit Reporter, Notary Public, in and for the State of Connecticut, on Monday, August 18, *2003,* at 9:39 a.m., at the offices of Livingston, Adler, Pulda, Meiklejohn & Kelly, 557 Prospect Avenue, Hartford, Connecticut, pursuant to the Federal Rules of Civil Procedure.'

```
            PATRICIA TYSZKA, LSR, RMR COURT
            REPORTING SERVICES
                189 Old Forge Road
            West Hartland, Connecticut 06091
             (860)379-7955 FAX (860)379-7955
```

1      Q    Now, can you tell from this document
2   whether -- does this have any of the notations on it
3   about whether or not people delivered below par?
4      A    No, it does not.
5      Q    So you can't tell from this document whether,
6   for example, Mike P. delivered below par?
7      A    From this particular document, no; but I would
8   have available to me subsidiary documents -
9      Q    Upon which this was built?
10     A    Precisely.
11     Q    Or that Gregg was below par for the two weeks
12  he's there?
13     A    Correct.
14     Q    Okay.  Mr. McCabe, I'm going to hand you three
15  documents marked 8A, 8B, and 8C.   I just want to ask you
16  about each one in turn.
17          For the record, let me identify 8A as a
18  Special Investigations & Recoveries Investigative
19  Report.  Do you recognize this document?
20     A    Yes.
21     Q    It's a five-page document?
22     A    Correct.
23     Q    It appears to represent an investigative
24  report for Wednesday, November 4th, 1998 and Thursday,
25  November 5th, 1998.   Why don't you take a minute and -

1       A       Yes.

2       Q       No, just this document.

3       A       I'm sorry.        Mm-hmm.

4       Q       Is that a yes?

5       A       Yes.

6       Q       Okay.

7       A       It represents those two days.

8       Q       What led you to employ Ron Blanchard and Ray

9    Looney to do a surveillance on Mr. Callahan in 1998?

10      A       I was auditing routes in the manner that I

11   told you that we referred to previously as our

12   "primitive" system of grabbing the pinks -- which are

13   the pink copies of our invoice that were retained, the

14   office copies -- calling the customers and, if you will,

15   simulating a rudimentary GPS system where we kind of put

16   times together of where they were arriving, what time

17   they were arriving at what stops.

18              With Mike, we made the observation a couple of

19   times that he seemed to falloff the map; that is, he

20   seemed to deliver wine very quickly for a spurt, make

21   many stops, and then he would disappear.

22      Q       What do you mean by "disappear"?

23      A       You're at a stop and your next stop is nine

24   miles away.    So doing 35 miles an hour, he should be

25   there in 15, 18 minutes; and he would get there

1   two-and-a-half hours later.   We wanted to see what those

2   lapses were, and we employed Mr. Looney and

3   Mr. Blanchard to do a surveillance for a couple of days.

4       Also, previous to that it had been noted to us

5   that on midday -- and this is -- this, if you will, was

6   the triggering event.   I had these -- if you willI that

7   problem that Ilve just related to you in the background,

8   and an employee related to someone in our officel which

9   came to me, that at midday in an afternoon a few weeks

10  before this happened, that that person bumped into

11  Mr. Callahan doing his groceries at a supermarket when,

12  you know, our rules of employment are if you need to

13  leave your route for anything other than your lunch, you

14  would ask permission to do so.

15      Q   How long is the lunch that employees are

16  given?

17      A   One-half hour.

18      Q   Is there a rule that says one has to eat lunch

19  during the half-hour that they have for lunch?

20      A   No.   There is a rule that says you cannot

21  leave your route, though.   That is, if you -- the

22  presumption is you would stop at a point.   If you wanted

23  to take a half-hour in any way you saw fit, to relax, if

24  you did it in the course of your route, that would be

25  acceptable.

```
 1            Q     Well, I am confused.        If I make a delivery to
 2      Roger's liquor store which is about a half a block from
 3      here -
 4            A     Yes.
 5            Q     -- and it's about the time I decide that I
 6      want to take my half-hour lunch -
 7            A     Correct.
 8            Q     -- am I supposed to leave the truck there and
 9      walk the mile to the Prospect Cafe to have a sandwich?
10            A     No.
11            Q     How do I get to Prospect Cafe?
12            A     You would go to Prospect Cafe.
13            Q     If I decided that my doctor wanted me to eat
14      healthy, and I wanted to get a salad at the Stop & Shop
15      which is a block or two beyond the Prospect Cafe and get
16      a salad from the salad bar, am I allowed to park my
17      truck and go in and get a salad?
18            A     We don't have any requirements as to, yeah,
19      what you can eat or what you cannot eat.                    ~r
20      requirement would be how long you take to do that
21      operation.        If you had to leave your -- if you had to
22      get a salad that was six or seven towns away, you
23      would -- we would like you to discuss that with me
24      before you started to do that.
25            Q     But there's nothing wrong with me parking my
```

1    truck and going into Stop & Shop?

2        A    No.

3        Q    And while I was there, instead of getting a
4    salad if I decided that I was going to use my half-hour
5    to pick up some groceries, stick them in the back of the
6    truck, nothing wrong with that either?

7        A    There would be nothing wrong with that if you
8    had a -- again, if you hadn't left your route to do
9    that.

10       Q    And the way you determine whether someone had
11   left their route was looking at where the stop was
12   before and where the next stop on their route would be
13   afterwards; is that correct?

14       A    Correct.   Yes.   Yes.

15       Q    Now, when Ray Looney and Ron Blanchard -- let
16   me just ask you, any particular reason why you used
17   Blanchard and Looney?

18       A    They seemed credible.   They -- Mr. Looney was
19   a retired FBI agent.  Mr. Blanchard was a former state
20   trooper detective and -

21       Q    He was actually chief of detectives for the
22   Town of Watertown, wasn't he?

23       A    I think so, but I think he -- wasn't he also a
24   state police?

25       Q    Well, I don't know; you hired him.

1   A   Okay.
2   Q   And Ray was the former head agent in the New
3   Haven office, right?
4   A   I believe so, yes.
5   Q   As a result of the investigation that they did
6   on what's a report on Exhibit 8A, when you reviewed
7   that, was there a period of two-and-a-half hours in
8   which Mr. Callahan dropped from the radar screen that
9   day?
10   A   No.
11   Q   Now, the next document is Exhibit 8B.   Do you
12   see that?
13   A   Yes.
14   Q   Which indicates the surveillance report for
15   Thursday, November 19th?
16   A   Mm-hmm.
17   Q   And this was a report submitted to you
18   subsequent to an investigation by Blanchard and Looney,
19   right?
20   A   Yes, indeed.
21   Q   As a result of receiving what's been marked as
22   Exhibit 8A and 8B, did you take any actions with respect
23   to Mr. Callahan?
24   A   No.
25   Q   And Exhibit 8C is what's been labeled a

1      photographic report; is that correct?

2         A    Yes.  That was an inventory of photographs

3      taken.

4         Q    And they actually submitted photographs to

5      you?

6         A    Yes.

7         Q    This report and the photographs, what did you

8      do with them when you got them from Looney and

9      Blanchard?

10        A    Well, I discussed them with Mr. Looney.  I

11     discussed them with Mr. Weiss and -

12        Q    Did -- go ahead.

13        A    That's the answer to the question.

14        Q    Did you put these photographs and these

15     reports in Mr. Callahan's personnel file?

16        A    No.

17        Q    Did you put them in a separate file?

18        A    I had a general driver delivery issues file

19     that they were in.

20        Q    And the photographs were put in there, too?

21        A    Correct.

22        Q    Do you know where those photographs are now?

23        A    I'm presuming they might still be in that

24     particular file.

25        Q    Now, when you said you discussed the report

1   and the photographs with Mr. Looney -- was it Mr. Looney
2   or Mr. Blanchard you discussed it with?
3       A   The main person I discussed the investigation
4   with was Mr. Looney.
5       Q   Okay.  Other than these reports, did
6   Mr. Looney provide you with any analysis or observations
7   about Mr. Callahan?
8       A   Not that I could recall at the time.
9       Q   Did you tell Mr. Looney that you were trying
10  to track Mr. Callahan leaving the radar screen?
11      A   Precisely.  I mean, he knew why he was hired
12  certainly.
13      Q   Were these the only investigation/surveillance
14  days that you hired Looney and Blanchard to -
15      A   Yes.
16      Q   -- investigate Mr. Callahan?
17      A   Yes.
18      Q   Did you hire anybody else to perform any
19  surveillance on Mr. Callahan?
20      A   No.
21      Q   As a result of this report, I think you
22  indicated that you took no disciplinary action against
23  Mr. Callahan?
24      A   We did not.
25      Q   Is that because the reports didn't indicate

1    that Mr. Callahan was off the radar screen for an

2    inappropriate period of time?

3        A    Well, that's precisely what I was looking for.

4    I was looking for off the radar screen for a long period

5    of time.  You know, it be noted that he did leave his

6    route to -- he did leave his route to go home on one day

7    early on in the day, and in the afternoon he stopped at

8    a Home Depot type store, Loew's.

9        We -- my assessment was that, you know, I had

10    not found anything to substantiate at that time my

11    concern that he would -- you know, that he was leaving

12    his route on a -- for a prolonged period of time.  So no

13    action was taken towards Michael.

14        Q    Let me show you what's been marked as

15    Exhibit 9A and 9B.  Just for the record, I'll identify

16    9A is a Worldwide Wines final written warning dated

17    10/14/98.

18        A    Yes.

19        Q    And attached to it, 9B is a several-page

20    document, four-page document which happens to be a

21    payroll history report printout of Worldwide Wines, and

22    the run date is October 13th, '98.  Do you agree with

23    me?

24        A    I'm sorry?

25        Q    Across the top it's Payroll History Report